ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN (286202)
FRANCISCO J. MEJIA (306477)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, on Behalf of Itself and All Others Similarly Situated, <br><br>               Plaintiff, <br><br>    vs. <br><br> PROCEPT BIOROBOTICS CORPORATION, REZA ZADNO, LARRY L. WOOD, KEVIN WATERS, and HISHAM SHIBLAQ, <br><br>               Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of PROCEPT BioRobotics Corporation ("Procept" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Procept common stock between February 28, 2024 and February 25, 2026, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Procept and certain of the Company's directors and executive officers.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 27 of the 1934 Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the statements alleged to be materially false and misleading into this District.  Procept is also headquartered in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5. Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund, as set forth in the certification attached hereto and incorporated by reference herein, purchased Procept common stock during the Class Period and has been damaged thereby.

6. Defendant Procept is a medical technology company that sells surgical devices used in the treatment of benign prostatic hyperplasia. Procept common stock is traded on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "PRCT."

7. Defendant Reza Zadno ("Zadno") served as Procept's Chief Executive Officer ("CEO") and on Procept's Board of Directors ("Board") from February 2020 until his departure from the Company in September 2025.

8. Defendant Larry L. Wood ("Wood") has served as Procept's President and CEO since defendant Zadno's departure in September 2025, and as a member of the Board since April 2024.

9. Defendant Kevin Waters ("Waters") has served as Procept's Executive Vice President, Chief Financial Officer ("CFO") since January 2022. Prior to serving as CFO, Waters served as Procept's Senior Vice President, Chief Financial Officer from October 2018 until December 2021.

10. Defendant Hisham Shiblaq ("Shiblaq") served as Procept's Chief Commercial Officer from March 2019 until September 2025, when he departed the Company.

11. Defendants Zadno, Wood, Waters, and Shiblaq are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, customers, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly

disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, customers, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Procept common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**BACKGROUND**

15. Procept is a commercial stage medical technology company focused primarily on the treatment of benign prostatic hyperplasia ("BPH"), commonly known as an enlarged prostate. BPH generally affects older men and symptoms may include frequent urination, loss of bladder control, or problems with urination.

16. During the Class Period, Procept manufactured and sold medical devices that delivered its proprietary Aquablation therapy, which the Company claims is safer for the treatment

of BPH compared to alternative surgical treatments.  Each device consists of an image-guided surgical device (the "System") and a single-use handpiece that is disposed following its use in a procedure.

17.    Procept's Aquablation therapy uses a high-velocity saline water jet to remove unwanted prostatic tissue and relieve various symptoms caused by BPH.  The System serves as the primary user interface and allows the treating physician to, among other things, visualize key anatomical landmarks, identify target tissue for resection, and monitor resection progress in real-time during the procedure.  The handpiece emits high-velocity saline water during the procedure and integrates with other components of the System to provide live visualization of the patient's anatomy to assist the treating physician.

18.    Procept has a recurring revenue model that seeks to drive handpiece sales by growing its base of Systems deployed in the field.  During the Class Period, Procept sold its handpieces for approximately $3,200 per unit and each System for more than $400,000.  As Procept's installed base of Systems in the field has matured, revenues derived from handpiece sales have become a larger percentage of the Company's revenue base.  For example, in fiscal 2025 handpiece revenues had grown to approximately 60% of Procept's total revenues from 50% of total Company revenues in 2023.  Thus, Procept's financial performance depends to a critical extent on maintaining sustained handpiece growth.

19.    During the Class Period, Procept reported the number of  handpieces and Systems sold within the United States – where the Company generates the substantial majority of its revenues – ostensibly allowing investors to determine the utilization of each installed System in a quarter.  Although Procept has historically refrained from disclosing the amount of actual procedures performed in the field, the Company has long maintained that its reported unit sales are commensurate with the number of procedures performed, and therefore this metric provides an accurate representation of underlying client demand.

20.    During the Class Period, Procept and its executives claimed that utilization of the Company's devices was increasing.  For example, for its first fiscal quarter of 2024, Procept reported that the Company's installed base had grown more than 80% to more than 350, compared

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                     - 4 -

to roughly 190 units in the prior year quarter.  Notably, handpiece unit sales increased sequentially during every quarter reported over the same period, suggesting that utilization among Procept's deployed Systems was increasing.  Speaking during the corresponding conference call, Company executives highlighted these purported growth trends.  For example, defendant Waters represented that Procept was experiencing "increased utilization across all [customer] cohorts," which he attributed in part to growing customer adoption of the Company's technology.  Defendant Zadno similarly touted the purportedly "increased utilization" by Procept's customers, which he represented demonstrated "growing" customer and patient demand for the Company's technology.

21.    Defendants continued to highlight the purported utilization of Procept's Systems throughout the Class Period.  For example, during Procept's first quarter of 2025 ("1Q25") earnings announcement, defendant Zadno represented that "procedural momentum" had remained "robust" going into the second quarter despite an industry-wide shortage in saline supplies that had limited procedures in the United States.  Defendant Waters further represented that the "strong" procedure volumes reported in the quarter had "been driven by the strength of the business."  Notably, defendant Shiblaq stated that daily procedure rates were "now back in full swing" and assured investors that Procept was "on track" to meet its forecast.

22.    Procept also represented that its reported handpiece sales were in line with the number of procedures performed in the field.  For example, speaking during a May 2024 conference call, defendant Waters represented that the Company's customers "tend to order as they need [a] product" and assured investors that Procept "would be proactive" if that dynamic changed, while noting "we just haven't seen anything there [yet]."  Later, in August 2025, defendant Waters further represented that the "differential" between procedures and handpiece sales had "remained relatively consistent" since the Company's initial public offering in September 2021.

23.    These and other similar statements caused the price of Procept shares to remain elevated during the Class Period.  Capitalizing on the artificially inflated price of Procept shares, in October 2024 the Company conducted a registered public stock offering where it sold roughly $175 million in Procept shares (the "SPO").  Company insiders, including defendants Zadno,

Waters, and Shiblaq, similarly took advantage of the inflated price of Procept shares to collectively sell $90 million in Procept shares during the Class Period. Notably, of the more than $38 million worth of Procept shares sold during the Class Period by defendant Zadno, over $26 million was sold directly in the SPO as part of the underwriters' exercise of their over-allotment option.

24. Unbeknownst to investors, however, Procept artificially and temporarily inflated its financial performance and key operating metrics via an extensive discount program that incentivized customers to place bulk handpiece orders in excess of underlying procedures. Contrary to defendants' Class Period assurances that the "differential" between handpiece unit sales and procedures had "remained relatively consistent," Procept's discount program had caused handpiece orders to materially exceed procedures in every quarter during the Class Period. These undisclosed sales tactics artificially inflated Procept's reported U.S. handpiece unit sales and revenues by pulling forward demand at the expense of future periods. Rather than disclose these adverse facts, defendants continued to incentivize bulk orders throughout the Class Period, which caused the excess field handpiece inventory to grow to more than 10,000 units by Class Period end. As a result, Procept was acutely exposed to a material undisclosed risk of significant financial and reputational harm once the truth regarding its discounting program was revealed to the market.

25. Then, on August 6, 2025, Procept announced earnings results for its second fiscal quarter of 2025, revealing that handpiece unit shipments had unexpectedly deteriorated. In addition, Procept disclosed that it expected to ship 13,350 handpieces the following quarter, missing consensus estimates by nearly 500 units. During the corresponding conference call, defendant Zadno further revealed that defendant Shiblaq was abruptly departing as the Company had chosen to eliminate the position of Chief Commercial Officer. Defendant Zadno stated that the organizational change was made to "strengthen" Procept's "commercial execution." Notably, defendant Zadno also left the Company in September 2025 just before the discounting program and inventory overstocking issues came to light.

26. Then, on November 4, 2025, Procept announced its third quarter earnings results, revealing that handpiece unit sales had missed the already disappointing sales guidance issued during the prior quarter. During the corresponding conference call, defendant Waters further

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 6 -

revealed that Procept was reducing its annual handpiece sales guidance by 1,000 units to allow for the "optimization of field inventory." When asked by analysts about the revised guidance, defendant Wood admitted that Procept had not "been managing customer inventory . . . levels" and that some customers were "probably carrying too much." As a result, defendant Wood stated that unit sales in the following quarter would be impacted by efforts to "optimize those par levels."

27.    Defendants, however, continued to conceal the full extent and severity of customer inventory issues. For example, defendant Wood described Procept's optimization efforts as a "little bit of destocking" and claimed that some customers "are probably not carrying enough inventory." Defendant Waters similarly assured investors that "there's not really a slowdown in the business."

28.    Then, on February 25, 2026, Procept announced its fourth quarter earnings results, disclosing the number of actual procedures performed in the field over the prior three years. The supplemental data, which had not been previously disclosed to investors, revealed that U.S. handpiece unit sales had materially exceeded procedures in every quarter since the first quarter of 2023, resulting in cumulative excess field inventory of more than 10,000 units. In addition, Procept revealed that its U.S. handpiece unit sales had contracted in the quarter by approximately 30%, falling from approximately 13,200 units in the third quarter to approximately 9,400 units.

29.    In connection with the earnings announcement, defendant Wood further revealed that Procept was eliminating a longstanding, previously undisclosed discount program designed to incentivize customers to place bulk orders during "the final weeks" of every quarter, which had negatively impacted handpiece sales. As a result of Procept's discount program, defendant Wood revealed that handpiece sales had "historically" exceeded actual procedures by 8% to 16% every quarter.

30.    During Procept's earnings call, analysts pressed Company management for information regarding the Company's discount program. For example, an analyst from Truist Securities inquired about the "health" of the underlying demand for procedures given the various "seemingly transient . . . externalities" that Procept had previously used to excuse lackluster procedure volumes. In response, defendant Wood stated that Procept's revenue "shortfall" was

driven by customers "stocking up" on discounted handpieces "at the end of a quarter," while also acknowledging that the Company "had never" reported on actual procedures.

31.     As a result of these serial disclosures, the price of Procept shares has declined by more than 75% from its all-time high of approximately $100 per share during the Class Period to less than $25 per share following the end of the Class Period and has continued to decline subsequently, inflicting substantial economic damages on investors.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

32.     The Class Period begins on February 28, 2024.  After market close on February 27, 2024, Procept issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ending December 31, 2023 ("4Q23 Release").  The 4Q23 Release stated that Procept generated U.S. handpiece revenue of $21.6 million, representing an increase of 109% from $10.4 million in the prior year quarter.

33.     The 4Q23 Release quoted defendant Zadno who claimed that Procept had "'succeeded'" in increasing customer utilization, stating in pertinent part as follows:

> "*We succeeded in elevating the average monthly utilization in the U.S. by approximately 10 percent* – an exceptional achievement, especially considering the significant 89% increase in our install base."

34.     That same day, Procept held a conference call with analysts to discuss the Company's financial and operational results for its fiscal year and fourth fiscal quarter of 2023, which was hosted by defendants Zadno and Waters.  During his prepared remarks, defendant Waters stated that Procept had "continue[d]" to experience "increased" utilization, which he attributed to increased customer adoption of the Company's technology and "strong commercial execution," stating in pertinent part as follows:

> *Monthly utilization per account, 7.3, increased approximately 13% compared to the fourth quarter of 2022*.  Utilization outperformance in the fourth quarter was due to normal fourth-quarter seasonal strength from elective procedure volume, the direct reflection of strong commercial execution and surgeons taking the next step to adopt Aquablation therapy as their treatment of choice for all res[p]ective procedures.
>
> *We continue to see increased account level utilization over time as we train new surgeons and increase utilization of our existing surgeon base.  We shipped approximately 6,400 handpieces in the United States in the fourth*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 8 -

*quarter, representing unit growth of 116% compared to the fourth quarter of 2022 with stable average selling prices*.

35.     Defendant Zadno similarly highlighted the purported growth in customer utilization, which he claimed was due to "strong underlying demand," stating in pertinent part as follows:

> *We increased average monthly utilization in the US by approximately 10%, an exceptional feat, especially considering the substantial 89% increase in our US install base*. The significant increase in new accounts in conjunction with our ability to get these accounts of the utilization care faster further amplifies my pride in our team's accomplishment throughout the year.
>
> *Given the strong underlying demand for Aquablation therapy, we were able to deliver average utilization of approximately 6.6 handpieces per account per month in 2023 and a record 7.3 handpieces per account in our fiscal fourth quarter*.

36.     On May 1, 2024, Procept issued a press release reporting the Company's financial results for its first fiscal quarter ending March 31, 2024 ("1Q24 Release").  The 1Q24 Release stated that Procept generated U.S. consumable revenue of $23.6 million, representing an increase of 101% from $11.7 million in the prior year quarter.

37.     That same day, Procept held a conference call with analysts to discuss the Company's financial and operational results for its first fiscal quarter of 2024, which was hosted by defendants Zadno, Waters, and Shiblaq.  During his prepared remarks, defendant Waters represented that Procept had continued to experience "increased utilization across all cohorts" which he stated was due to "strong" commercial execution and growing adoption, stating in pertinent part as follows:

> *Handpiece growth was driven by an increase in the installed base of AquaBeam Robotic Systems which has grown 84% from the first quarter of 2023. Additionally, monthly utilization of 6.8 handpieces per account increased approximately 7% compared to the first quarter of 2023*.
>
> *Utilization in the first quarter exceeded our initial guidance* and as expected, was down sequentially, given normal elective procedure seasonality compared to the calendar fourth quarter.  *Overall, we continue to see increased utilization across all cohorts, which is a direct reflection of strong commercial execution, training new surgeons and surgeons taking the next step to adopt Aquablation therapy as their treatment of choice for all respective procedures*.

38.     Defendant Waters also stated that Procept sold more than 6,800 handpiece units during the quarter, stating as follows:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 9 -

*We shipped 6,811 handpieces in the U.S. in the first quarter representing unit growth of 100% compared to the first quarter of 2023*. First quarter handpiece average selling prices were approximately $3,200.

39.    Defendant Zadno similarly emphasized the purported "increased utilization" of the Company's installed base of Systems, which he claimed reflected the "growing" customer and patient demand for Procept's products, stating in pertinent part as follows:

Growth in the quarter was driven by strong U.S. system sales, *increased utilization from our expanded U.S. installed base* and record international revenues. *U.S. monthly utilization increased approximately 7% compared to the prior year period, which is significant given an 84% increase in our installed base*.

We exited the first quarter of 2024 with a U.S. installed base of 354 systems out of target market of 2,700 total hospitals that performed BPH surgeries. The significant increase in new accounts in conjunction with our ability to move accounts up the utilization curve further *demonstrates not only our team's consistent commercial execution but growing customer and patient demand for Aquablation therapy*.

40.    In addition, defendant Shiblaq emphasized Procept's quarterly "procedure volume" growth, which he attributed to "active surgeon growth," stating in pertinent part as follows:

*Regarding first quarter procedure volumes, the primary drivers of procedure volume continued to be active surge, active surgeon growth and adding new surgeons at both existing and new accounts*. Additionally, our ability to maintain surgeon retention rates above 90% demonstrates the clear patient and surgeon benefits of our technology, which ultimately leads to increased utilization as a company, we benefit greatly from this high level of surgeon retention as our commercial team can focus on adding new surgeons.

41.    During the call, an analyst inquired about a potential "discrepancy" between handpiece sales growth and utilization growth. In response, defendant Waters represented that the Company's customers "tend to order as they need [a] product" and assured investors of the Company's longstanding commitment that it "would be proactive" if there was ever a "change [in] those dynamics," stating in pertinent part as follows:

So[,] for us, our customers, we sell direct in the US. So we don't sell to distributors and therefore, *our customers tend to order as they need product*, which is somewhere in the five to 10 range is the standard order[ed size]. *We don't have large stocking orders*, we don't have fulfillment houses. So for us, we don't see that. I'd also suggest that our visibility into procedures is very high. So we have the ability to see who's doing our cases when procedures are performed and we have a high degree of visibility there. So I don't have any concern or there hasn't been any changes in trends between handpieces sold and procedures. *And in fact, when we went public back in 2021, we told the investment community if there ever was a change kind of between those dynamics that we would be proactive. And we just haven't seen anything there*.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 10 -

42.    On August 1, 2024, Procept issued a press release reporting the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Release").  The 2Q24 Release stated that Procept generated U.S. handpiece revenue of $27.3 million, representing an increase of 101% from $13.6 million in the prior year quarter.

43.    That same day, Procept held a conference call with analysts to discuss the Company's financial and operational results for its second fiscal quarter of 2024, which was hosted by defendants Zadno, Waters, and Shiblaq.  During his prepared remarks, defendant Waters represented that Procept had shipped approximately 8,000 handpieces in the quarter and continued to "see increased" customer utilization, which he claimed reflected "strong" commercial execution, stating in pertinent part as follows:

> Handpiece growth was driven by an increase in the install base of AquaBeam Robotic Systems. *Additionally, monthly utilization of 7.1 handpieces per account increased approximately 15% compared to the second quarter of 2023.  Utilization in the second quarter exceeded our expectations and represents a 4% sequential increase from the first quarter*.
>
> Overall, *we continue to see increased utilization across cohorts, which is a direct reflection of strong commercial execution*, which includes training new surgeons, high surgeon retention, and opening new accounts in a timely manner. *We shipped approximately 8,000 handpieces in the US in the second quarter, representing unit growth of 105% compared to the second quarter of 2023*.

44.    Defendant Waters continued, representing that customer utilization in the second quarter was "very strong" and exceeded internal expectations, stating in pertinent part as follows:

> I'll start with handpieces utilization. *We did have a very strong – stronger than expected even internally second quarter on utilization, increasing 15% sequentially*.  And if you look at kind of what Q2 of 23 did, utilization was actually down.  So our first half, I would argue, is much stronger than our historical trends and I wouldn't read in anything into kind of the back half versus first half.

45.    On October 28, 2024, Procept issued a press release reporting the Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24 Release").  The 3Q24 Release stated that Procept generated U.S. handpiece revenue of $29.6 million, representing an increase of 74% from $17 million in the prior year quarter.

46.    That same day, Procept held a conference call with analysts to discuss the Company's financial and operational results for its third fiscal quarter of 2024, which was hosted by defendants Zadno, Waters, and Shiblaq.  During his prepared remarks, defendant Waters

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                          - 11 -

highlighted Procept's handpiece utilization growth, which he claimed was driven by "an increase in the installed base" of Systems, stating in pertinent part as follows:

> *Handpiece growth was driven by an increase in the installed base of robotic systems. Additionally, monthly utilization per account increased approximately 7%, compared to the third quarter of 2023. We shipped approximately 8,740 handpieces in the US in the third quarter, representing unit growth of 79%, compared to the third quarter of 2023*.

47.    Defendant Zadno also highlighted Procept's purportedly "increased" customer utilization, which he claimed had "exceeded" the Company's internal expectations, stating in pertinent part as follows:

> *Growth in the quarter was driven by strong demand and higher average selling prices for our robotic system, increased utilization from our expanded US installed base and record international revenues*. We exited the third quarter of 2024 with a US installed base of 445 systems, representing growth of 64%, compared to the prior year period.
>
> *Additionally, we exceeded our utilization per account expectations for the quarter*, despite substantial growth in our US installed base and the temporary removal of sales representatives from the field as we began training our sales team on the hydro system.

48.    During the call, an analyst asked about the impact that changes to Procept's sales organization had on customer utilization. In response, defendant Waters represented that the "procedure environment" in September "felt really strong," stating in pertinent part as follows:

> So yes, I can't specifically dollarize what that impact was in the third quarter of taking reps out of the field. But what we will say is we moved throughout the quarter, *we definitely saw a strong September in procedures*, even with our reps coming out of the field. So it was definitely a headwind, but the procedure environment itself in September felt really strong for us.

49.    On February 25, 2025, Procept issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ending December 31, 2024 ("4Q24 Release"). The 4Q24 Release stated that Procept generated U.S. handpiece revenue of $29.3 million, representing an increase of 36% from $21.6 million in the prior year quarter. In addition, the 4Q24 Release issued annual revenue guidance of approximately $320 million, representing year-over-year growth of 42% compared to reported revenue of $224.5 million in 2024.

50.    That same day, Procept hosted a conference call with investors to discuss the Company's financial and operational results for its fourth fiscal quarter of 2024, which was hosted

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 12 -

by defendants Zadno, Waters, and Shiblaq.  During his prepared remarks, defendant Waters stated that Procept shipped approximately 8,750 handpieces within the United States during the fourth quarter.

51.    Defendant Shiblaq also represented that hospitals that were not impacted by the saline shortage had delivered "strong sequential growth" during the fourth quarter and assured investors that the Company remained "very excited and bullish" regarding the ongoing procedure trends, stating in pertinent part as follows:

> ***And when we look at the trends of the hospitals that had a normalized utilization in the fourth quarter, we were very encouraged because they performed exactly as we expected in the fourth quarter***, which is seasonally a very strong quarter for all procedures, especially elective procedures.  I mean, they delivered strong sequential growth in that period of time.
>
> And we are in every single case.  We track these metrics very closely.  And so, ***we continue to be very excited and bullish about the trends that are going on with our procedures.  And if you just look at that segment of customers, it performed as expected***.

52.    In addition, defendant Waters claimed that Procept would "get the majority" of the roughly 2,000 impacted procedures back and that the Company was seeing "expanding utilization" in February and March, stating in pertinent part as follows:

> First, I would suggest our Q1 guidance doesn't fully assume that all 2,000 procedures we lost in Q4 come back.  I think we get the majority of those back, but there's a practical reality here where they will not all come back in the first quarter.  ***And when you look at our guide in Q1 of 10,750 handpieces, this does apply just overall utilization relatively flat to Q1 of '24***.
>
> But as I previously said, we did see lingering impacts from this into January.  So I'd suggest on an apples-to-apples basis, when we're looking at February and March, where the saline impact is behind us, ***we are seeing expanding utilization in those accounts***.

53.    Defendant Waters continued, stating that Procept was experiencing "tremendous momentum," as follows:

> And the Q1 utilization as an absolute metric is heavily impacted by the lingering impacts in January.  So without reading into it too much, it really is flat year-over-year because of the impacts we're seeing in January, but ***we're seeing tremendous momentum in both February and March***.  And then I would just remember my comments about us coming off of Q4 and us just being somewhat cautious in our guidance just to continue to ensure we hit our expectations that we put out there as a company.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                - 13 -

54.     On April 24, 2025, Procept issued a press release reporting the Company's financial results for its first fiscal quarter ending March 31, 2025 ("1Q25 Release"). The 1Q25 Release stated that Procept generated U.S. handpiece revenue of $38 million, representing an increase of 61% from $23.6 million in the prior year quarter. In addition, the 1Q25 Release reported that Procept was increasing its annual revenue guidance by $3 million to $323 million, up from $320 million.

55.     The 1Q25 Release quoted defendant Zadno who represented that "procedural momentum" had remained "robust" and claimed that the Company was "well-positioned" for continued "strong procedure growth," stating in pertinent part as follows:

> "*We began 2025 with strong performance, delivering total revenue growth of 55% in the first quarter. Procedural momentum remained robust heading into the second quarter*, reinforcing our confidence that the saline disruption is behind us and that *we are well-positioned for another year of strong procedure growth*," said Reza Zadno.

56.     That same day, Procept held a conference call with analysts to discuss the Company's financial and operational results for its first fiscal quarter of 2025, which was hosted by defendants Zadno, Waters, and Shiblaq. During his prepared remarks, defendant Shiblaq stated that Procept sold more than 11,200 handpieces in the quarter.

57.     Defendant Waters also issued U.S. handpiece sales guidance of approximately 52,500 units and noted that he remained "confident" in the Company's "quarterly procedure volumes," stating in pertinent part as follows:

> *Turning the US handpieces for the full year, we continue to expect sales of approximately 52,500 handpieces representing a 63% increase in unit volume compared to 2024.* We remain confident in our visibility into new account launches and quarterly procedure volumes which contributed to our outperformance in the first quarter.

58.     During the call, an analyst from Piper Sandler noted that procedures were "really strong in the quarter" and inquired regarding procedures that had been pushed into the quarter due to the saline shortage. In response, defendant Waters represented that quarterly procedure volumes were "driven by the strength of the business" as impacts from the saline shortage were "net neutral" on results, stating in pertinent part as follows:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                          - 14 -

We did see some impact from deferrals in the fourth quarter, but those were largely offset by the sailing [sic] impact that still lingered into January and February. So, I would characterize that dynamic as net neutral for procedures in Q1, which really means the *Q1 procedures are just driven by the strength of the business as opposed to backlog coming into Q1*, which was offset by the continued weakness into January and lingering into February.

59.    Defendant Shiblaq added that the Company was "on track" to meeting "[its] forecast" and that daily procedure rates were "now back in full swing," stating in pertinent part as follows:

I would just add, Matt, I'm sorry, Craig, it's sham that you know we continue to have, great insight into daily procedures, a number of new surgeons, surgeon retention rates, and exiting March into April, *we're on track to where we want to be as far as launching new accounts and hitting the surgeon retention rates and adding new surgeons. At the rate we need to be to hit our forecast, sailing [sic] is behind us. I think March is the first month where we felt confident that that that the dynamic that's now gone and we're now back in full swing as far as far as daily procedure rates*.

60.    The statements referenced in ¶¶32-59 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)    that, during the Class Period, Procept had utilized an extensive discount program designed to incentivize its customers to place bulk orders in excess of procedure demand;

(b)    that Procept's undisclosed discount program had artificially and unsustainably inflated the Company's reported U.S. handpiece unit sales and revenues by pulling forward sales at the expense of future periods;

(c)    that Procept's undisclosed discount program had caused customer handpiece orders to materially exceed underlying procedure demand throughout the Class Period and that this differential had materially grown over time;

(d)    that Procept's consistent surplus of U.S. handpiece unit sales relative to performed procedures had created a glut of field inventory and overstocking amongst Procept's customer base, amounting to more than 10,000 excess units by the end of the Class Period;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 15 -

(e)     that, as a result of (a)-(d) above, defendants' representations during the Class Period regarding Procept's handpiece unit sales and the utilization of Procept's field Systems were materially overstated;

(f)     that, as a result of (a)-(e) above, Procept was acutely exposed to material undisclosed risks of significant operational and financial harm; and

(g)     that, as a result of (a)-(f) above, Procept was unable to achieve its stated 2025 handpiece sales and revenue guidance and such guidance lacked a reasonably achievable factual basis.

61.     Then, on August 6, 2025, Procept announced earnings for its second fiscal quarter of 2025 ("2Q25 Release"), revealing that the Company had only sold approximately 12,750 handpieces in the United States during the quarter.  During Procept's earnings call, defendant Waters reported that Procept expected to ship approximately 13,350 units in the following quarter, significantly below consensus estimates of more than 13,840 units.  Procept's quarterly handpiece sales guidance also implied that the Company would need to grow handpiece sales by approximately 25% year-over-year in the fourth quarter in order to meet the Company's annual unit sales guidance.  In addition, defendant Zadno revealed that Procept was eliminating the role of Chief Commercial Officer in order to "strengthen" the Company's "commercial execution."  As a result of this organizational change, defendant Zadno stated that defendant Shiblaq would be departing the Company.

62.     Following the earnings announcement, analysts focused on Procept's disappointing handpiece performance.  For example, in a report published by BTIG, analysts stated that Procept's quarterly handpiece sales were "soft" when "adjusting for a saline catch-up," and noted that the "onus [was] on 4Q25 to deliver" given the Company's third quarter sales guidance.  Analysts at William Blair similarly stated that Procept's quarterly handpiece guidance would potentially create "angst among investors" as it implied a "mid-20s U.S. handpiece utilization increase year-over-year in the fourth quarter."

63.     On this news, the price of Procept common stock fell from $45.69 per share on August 6, 2025 to $38.41 per share on August 8, 2025, a decline of approximately 16% over a

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                  - 16 -

two-day trading period, on above-average trading volume.  However, the price of Procept common stock remained artificially inflated as defendants continued to make materially false and misleading statements and the full truth regarding the Company's business and operations was not disclosed to investors.

64.    For example, the 2Q25 Release stated that Procept generated U.S. handpiece revenue of $43 million, representing an increase of 58% from $27 million in the prior year quarter.  In addition, the 2Q25 Release reported that Procept was increasing its annual revenue guidance by $2.5 million to $325.5 million, up from $323 million.

65.    That same day, Procept hosted a conference call with investors to discuss the Company's financial and operational results for its second fiscal quarter of 2025, which was hosted by defendants Zadno, Waters, and Wood.  During his prepared remarks, defendant Waters increased U.S. handpiece sales guidance for fiscal 2025 by 500 units to 53,000 units and noted he remained "confident" in Procept's "quarterly procedure volumes," stating in pertinent part as follows:

> Turning to US handpieces.  ***For the full year, we now expect sales of approximately 53,000 handpieces, representing a 64% increase in unit volume compared to 2024***.  We remain confident in our visibility into new account launches and quarterly procedure volumes, which contributed to our outperformance in the second quarter.
>
> In terms of quarterly cadence, we expect to sell approximately 13,350 US handpieces in the third quarter.

66.    During the call, an analyst asked about Procept's quarterly utilization cadence, noting that the guidance "shifts back" utilization to the fourth quarter.  In response, defendant Waters represented that the growth reflected in Procept's fourth quarter guide was actually "slightly less" than the first three quarters given the prior saline shortages and assured investors that he "fe[lt] good" about utilization in the fourth quarter, stating in pertinent part as follows:

> I think the bigger question is, how can Q4 grow 25% if we're mid-single digits in the first half of the year.  And that's a relatively easy answer for us.  ***If you go back to Q4 of '24 with saline and our commentary around 2,000 lost procedures in Q4.  And if you take those and add them back to the '24 number, that's more of an apples-to-apples comparison***.
>
> And that would actually put the Q4 growth required at a number very comparable to the first nine months.  So I don't feel like we're sitting here today

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 17 -

relying on a huge hockey stick of growth in the fourth quarter to meet our targets. *If anything, I think you'll find the fourth quarter guide might even be slightly less than the first nine months.  So we feel good about the setup for the rest of the year*.

67.   Defendant Waters continued:

Yes.  And we're just probably going to talk semantics here, Ryan, because 4%, 5%, 6%, I mean, that's – I mean, *you can do the math on how many procedures that is.  I feel good about the setup for Q3*.  I'll just say that.

68.   In addition, an analyst from Oppenheimer inquired directly regarding the "ratio" of handpieces shipped compared to procedures actually performed in the quarter.  In response, defendant Waters represented that the "differential" between procedures and handpiece shipments had "remained relatively consistent" during Procept's time as a public company, and assured investors that actual procedures was a metric that Procept monitored "closely," stating in pertinent part as follows:

Yes.  Look, *we monitor this metric closely*.  We have the advantage here at Procept of having visibility into when all our procedures are being done.  And we also do not typically utilize distributors in the US and *that differential between procedures and handpieces has remained relatively consistent throughout our time as a public company*.

69.   The statements referenced in ¶¶64-68 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them, as set forth in ¶60.

70.   Then, on November 4, 2025, Procept announced earnings results for its third fiscal quarter of 2025 ("3Q25 Release"), revealing that Procept had only sold 13,225 handpieces during the quarter, which missed the Company's already disappointing sales guidance issued during the prior quarter.  During the corresponding conference call, defendant Waters further revealed that Procept was reducing its annual handpiece sales guidance by 1,000 units, down from 53,000 units to 52,000 units to allow for the "optimization of field inventory."  When pressed by analysts regarding the lowered handpiece guidance, defendant Wood admitted that Procept had not "been managing customer inventory by establishing par levels" and that some customers were "probably

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                - 18 -

carrying too much inventory." As a result, defendant Wood revealed that subsequent quarter sales would be impacted by efforts to "optimize those par levels" through a "little bit of destocking."

71.     On this news, the price of Procept common stock fell from $35.02 per share on November 4, 2025 to $31.30 per share on November 6, 2025, a decline of more than 10% over a two-day trading period, on above-average trading volume. However, the price of Procept common stock remained artificially inflated as defendants continued to make materially false and misleading statements and the full truth regarding the Company's business and operations was not disclosed to investors.

72.     For example, the 3Q25 Release stated that Procept generated U.S. consumable revenue of $44 million, representing an increase of approximately 50% from $30 million in the prior year quarter. In addition, the 3Q25 Release reiterated Procept's purported annual revenue trajectory of $325.5 million.

73.     That same day, Procept hosted a conference call with investors to discuss the Company's financial and operational results for its third fiscal quarter of 2025, which was hosted by defendants Wood and Waters. During his prepared remarks, defendant Waters stated that Procept sold approximately 13,225 handpieces during the quarter. In addition, defendant Waters stated that Procept expected to sell a total of 52,000 handpieces in fiscal 2025 and attributed the reduction in sales guidance to impacts related to the "optimization of field inventory," which he described as "modest headwinds," stating in pertinent part as follows:

> Turning the handpieces for the full year, *we now expect sales of approximately 52,000 handpieces, representing a 61% increase in unit volume compared to 2024*.

> The reduction in 4th quarter hand piece sales guidance reflects *modest headwinds* related to the optimization of field inventory resulting from the variable launch timing of recent hydros placements.

74.     During the call, an analyst from Bank of America Securities asked Company management about further information regarding the lowered handpiece sales guidance. In response, defendant Waters attributed the downward revision to "destocking" and "inventory optimization," but continued to assure investors that there was no "slowdown in the business," stating in pertinent part as follows:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                   - 19 -

Yeah, so if you look at what our guide entails compared to previous guides, we essentially have lowered the overall hand pieces sold number by about 1,000 systems, and really we mentioned destocking, we mentioned inventory optimization and a focus on launching accounts.

And it's really that dynamic flushing through via hand pieces sold in the 4th quarter and we do look forward to giving our investors an update on the procedure side of the business in February 26th, and *we believe when you look at that metric, you'll find that there's not really a slowdown in the business*, but we felt we needed to call out the handpiece dynamic that both Larry and I referred to in our script.

75.    Defendant Wood echoed these remarks, representing that Procept "may" experience a "little bit of destocking" as the Company established inventory levels for customers while maintaining that the Company would have a "good procedure quarter," stating in pertinent part as follows:

Yeah, just to add what Kevin said, and I think this is just a little bit of a business maturity issue as we as we get larger is we haven't really been managing customer inventory by establishing par levels for each customer, *so we have some customers that are probably not carrying enough inventory*, and we certainly never want a customer to not be able to do a case because they don't have adequate inventory.

But at the same time, we have other customers that are probably carrying too much inventory, and you know our initial look at this probably says there's probably more inventory in the field than what's needed.  And so, as we optimize those par levels *we may see a little bit of destocking*.

But you know we're focused on procedure growth and that's what's going to drive the long-term health of the business, and you *know I'm expecting that we're going to have, a good procedure quarter in in you know in Q4* and that's, going to be our focus kind of go forward basis.

76.    The statements referenced in ¶¶72-75 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them, as set forth in ¶60.

77.    Then, on February 25, 2026, Procept announced earnings results for its fourth fiscal quarter and year ending December 31, 2025.  Contrary to prior Class Period assurances that U.S. handpiece sales were largely commensurate with procedures, Procept revealed that handpiece sales had in fact materially exceeded procedures in every quarter since the first fiscal quarter of 2023, a differential which had consistently grown over time, ultimately resulting in cumulative excess field

inventory of more than 10,000 units.  Due to this inventory glut, Procept revealed that quarterly handpiece unit sales in the United States had declined significantly from 13,225 units in the third quarter to 9,400 units, representing a sequential decline of nearly 30%.  As a result, Procept had widely missed its annual revenue guidance by tens of millions of dollars.

78.     During the corresponding conference call held later that day, defendant Wood revealed that the Company was eliminating a longstanding discount program that had incentivized customers to place bulk orders "[during] the final weeks" of every quarter, impairing the Company's ability to make additional handpiece sales in subsequent quarters, stating in pertinent part as follows:

> Separate from establishing inventory targets, *it became clear as the quarter progressed that accounts had become accustomed to purchasing large quantities of handpieces and receiving bulk discounts in the final weeks of the quarter*.

> I've always believed pricing discipline is foundational to long-term success. At Procept, I've been focused on implementation of hand piece price discipline, and as part of that, we eliminate the historical practice of providing discounts on bulk purchases, particularly at the end of the quarter.

> Despite custom requests, we remained disciplined and did not allow bulk purchases at a discount.  As a result, handpiece unit sales were approximately 80% of procedures in the 4th quarter, and for the first time, procedures exceeded handpieces sold.

79.     In addition, defendant Wood revealed that Procept was aligning handpiece sales with procedures going forward and admitted that handpiece sales had "historically" exceeded procedure volumes by 8% to 16%.

80.     During the call, analysts pressed Company management regarding the significant decline in the Company's handpiece sales.  For example, an analyst from Piper Sandler observed that the "level of softness" in handpiece sales "wasn't anticipated" and asked about the extent of the inventory "flush" that had occurred during the quarter.  In response, defendant Wood stated that customers had stopped "bulk purchasing" once Procept had ended its discounting program, stating in pertinent part as follows:

> The thing that came to light later in the quarter was how much our business practices.  Of allowing bulk purchases at a discount was influencing customer purchase behaviour and when we did a deep review of that, I just didn't think it made sense for us on a go forward to be running that practice and discounting that

way. ***I think without that incentive, customers no longer did the bulk purchasing and you know that's obviously what contributed to the revenue base***.

81.     In addition, an analyst from Truist Securities asked about the "health" of the actual underlying demand for procedures given the "seemingly transient . . . externalities" that the Company had previously used to explain procedure volume shortfalls.  In response, defendant Wood stated that Procept's revenue "shortfall" was driven by customers "stocking up" on discounted handpieces, while acknowledging that the Company "never reported" on actual procedures, stating in pertinent part as follows:

> Yeah, thanks for the question, and I understand where you're going with this. ***And again, one of the things that we've never reported on before was actual procedures. We'd always report on hand piece revenue and to provide a new level of transparency, we, externally we're going to talk about procedures***, and you look at our procedure growth, it was almost 70% in the quarter and so, compared to year over year.  So, I think the procedure demand.  And I'll tell you, even at that number we're trying to accelerate well past that and drive further growth beyond that.
>
> But it was pretty healthy procedure growth.  The revenue shortfall wasn't really driven on the procedure side. ***It really was about the customer ordering behaviour and it was being driven much more than probably we appreciated by these discounts that people have become accustomed to and we were living this cycle of people stocking up at the end of a quarter and then depleting going into the next quarter, which was leading to very lumpy sales***.

82.     On this news, the price of Procept common stock fell from $27.84 per share on February 25, 2026 to $22.69 per share on February 27, 2026, a decline of more than 18% over a two-day trading period, on above-average trading volume.  The price of Procept stock has continued to decline as the negative impacts of Procept's undisclosed discounting program and customer overstocking problems have been revealed to the market, falling to less than $18 per share by July 22, 2026.

83.     As a result of the declines in the price of Procept stock after the revelations of truth detailed herein, Plaintiff and other members of the Class suffered significant financial losses and economic damages under the federal securities laws.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Procept common stock during the Class Period (the "Class").  Excluded

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                            - 22 -

from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Procept common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Procept or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

86.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

87.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

88.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

90.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Procept, and their control over and/or receipt and/or modification of Procept's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

91.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

92.     The Individual Defendants, because of their positions with Procept, controlled the contents of Procept's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants is responsible for the accuracy of Procept's corporate statements and is, therefore, responsible and liable for the representations contained therein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 24 -

93.     Procept's procedure volumes, handpiece sales, and product adoption were among the most important issues facing the Company and the focus of Procept's management, including the Individual Defendants.  The Individual Defendants held themselves out as the persons most knowledgeable regarding the variances between handpiece unit sales and actual procedures performed and repeatedly represented that they were closely monitoring the relationship between utilization rates and handpiece sales.  For example, during Procept's May 2024 earnings call, defendant Waters represented that he and other executives at the Company had a "high degree of visibility" into procedures, stating that "we have the ability to see who's doing our cases when procedures are performed."  Defendant Waters further represented that "customers tend to order as they need product" and claimed that "there hasn't been any changes in [those] trends," while also assuring investors that the Company would be "proactive" in the event those dynamics changed.  Similarly, during the Company's August 6, 2025 earnings call, when asked about handpiece utilization versus shipments, defendant Waters responded, "we monitor this metric closely."  Likewise, when defendant Wood was asked whether the Company has "information on every single procedure" and how procedures tracked inventory, he confirmed, "we have perfect metrics."  These representations, mostly made at a time when Procept's undisclosed discount program were *already* causing handpiece unit sales to materially exceed underlying procedures, evince an intent to deceive the market, and thus support a strong inference of scienter.

94.     In addition, the Individual Defendants had the motive and opportunity to defraud investors.  Capitalizing on the fraud alleged herein, Procept sold approximately $175 million worth of Company shares at $91 per share in the SPO.  Defendant Zadno also sold more than $38 million in Procept shares at prices as high as $99 per share, including over $26 million worth of Procept shares in the SPO, while defendant Waters sold more than $4 million in Procept shares at prices as high as $83 per share and defendant Shiblaq sold more than $3 million worth of Procept shares at prices as high as $68 per share.  In total, Procept insiders collectively sold more than $90 million in Procept shares during the Class Period.  These sales were suspicious in timing and amount and out of line with historical trading patterns.

**LOSS CAUSATION**

95.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Procept common stock and operated as a fraud or deceit on Class Period purchasers of Procept common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Procept common stock declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein.  As result of their purchases of Procept common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICATION OF THE PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET**

96.    At all relevant times, the market for Procept common stock was an efficient market for the following reasons, among others:

(a)    Procept common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    as a regulated issuer, Procept filed periodic public reports with the SEC;

(c)    according to the Company's Form 10-K for the fiscal year ended December 31, 2025, Procept had approximately 56 million shares of common stock outstanding as of February 19, 2026;

(d)    Procept regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about Procept was rapidly reflected in and incorporated into prices for Procept ordinary shares during the Class Period.

97.    As a result of the foregoing, the market for Procept common stock promptly digested current information regarding Procept from all publicly available sources and reflected

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 26 -

such information in the price of the stock. Under these circumstances, all purchasers of Procept common stock during the Class Period suffered similar injury through their purchases of Procept common stock at artificially inflated prices and a presumption of reliance applies.

98. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

99. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Procept who knew that those statements were false when made.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - - 27 -

**COUNT I**

**For Violation of §10(b) of the 1934 Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

100.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Procept common stock during the Class Period.

103.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Procept common stock.  Plaintiff and the Class would not have purchased Procept common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

104.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Procept common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

105.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.    During the Class Period, defendants acted as controlling persons of Procept within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Procept, the Individual Defendants had the power and ability to control the actions of Procept and its employees.  Procept controlled the Individual Defendants and all of its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 24, 2026

s/ Shawn A. Williams
SHAWN A. WILLIAMS

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                  - 29 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Plaintiff") declares:

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      (a)      Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*In re Integra LifeSciences Holdings Corp. Sec. Litig.*, No. 3:23-cv-20321 (D.N.J.)
*Operating Eng'rs Constr. Indus. and Miscellaneous Pension Fund v. Neogen Corp.*, No. 1:25-cv-00802 (W.D. Mich.)

(b)      Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Zagami v. Wolfspeed, Inc.*, No. 6:24-cv-01395 (N.D.N.Y.)
*In re MGP Ingredients, Inc.*, No. 2:25cv02153 (D. Kan.)
*Hauser v. Organon & Co.*, No. 2:25-cv-05322 (D.N.J.)
*Reed v. Freeport-McMoRan Inc.*, No. 2:25-cv-04243 (D. Ariz.)
*Denha v. BellRing Brands, Inc.*, No. 1:26-cv-00575 (S.D.N.Y.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___26___ day of June, 2026.

Operating Engineers Construction Industry and
Miscellaneous Pension Fund

By: _____
M. Scott Anderson, Administrator

PROCEPT

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/31/2024 | 45 | $80.51 |
| 01/02/2025 | 240 | $82.50 |
| 01/03/2025 | 155 | $84.65 |
| 02/12/2025 | 415 | $64.91 |
| 02/13/2025 | 65 | $67.85 |
| 02/13/2025 | 150 | $67.55 |
| 02/26/2025 | 45 | $65.85 |
| 02/27/2025 | 125 | $65.62 |
| 04/03/2025 | 350 | $54.33 |
| 04/08/2025 | 520 | $48.96 |
| 04/09/2025 | 225 | $50.08 |
| 04/10/2025 | 385 | $50.82 |
| 06/11/2025 | 295 | $63.26 |
| 06/11/2025 | 605 | $63.36 |
| 08/15/2025 | 830 | $41.56 |
| 09/23/2025 | 1,310 | $39.26 |
| 10/28/2025 | 275 | $37.00 |
| 10/28/2025 | 355 | $36.96 |
| 10/29/2025 | 185 | $36.35 |
| 10/29/2025 | 865 | $36.03 |
| 11/04/2025 | 695 | $35.00 |
| 11/05/2025 | 465 | $33.58 |
| 11/26/2025 | 1,040 | $31.45 |
| 12/04/2025 | 430 | $33.97 |
| 12/04/2025 | 610 | $35.02 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 06/11/2024 | 320 | $67.40 |
| 06/12/2024 | 760 | $66.13 |
| 08/21/2024 | 2,550 | $80.45 |
| 11/11/2024 | 245 | $97.18 |
| 11/12/2024 | 635 | $97.43 |

Prices listed are rounded up to two decimal places.

*Opening position of 6,770 shares.